UNITED STATES FEDERAL DISTRICT COURT
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **GEORGIA M. SCOTT,** an individual, Plaintiff, | | Case No. |
| v. | | |
| **JEFFERSON B. SESSIONS,** Attorney General, Department of Justice, Federal Bureau of Investigation Defendant. | | **COMPLAINT** **JURY TRIAL DEMANDED** **LOCATION: OMAHA, NE** |

## INTRODUCTION

1.  This is an action seeking damages for the harassing and discriminatory actions inflicted by the Federal Bureau of Investigation (the "FBI") on an African-American female employee, Georgia Scott ("Plaintiff" or "Ms. Scott"), and retaliation against her for engaging in protected activity. The FBI violated Ms. Scott's rights protected by federal discrimination and harassment laws based on sex and race.

## JURISDICTION & VENUE

2.  This matter arises under federal and state law. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 based on Ms. Scott's federal claims set forth in this Complaint. This Court has supplemental jurisdiction of the Nebraska state law claims pursuant to 28 U.S.C. § 1367. Ms. Scott filed an EEO complaint on January 27, 2014, alleging discrimination and harassment based on her race and sex and retaliation after seeking EEO counseling.

3. The EEOC's Final Agency Decision is dated March 27, 2018, which Ms. Scott received on April 21, 2018. This Complaint is filed within 90 days after Ms. Scott's receipt of the Final Agency Decision.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the acts complained of here were orchestrated from, planned in, and conducted in this District.

## PARTIES

5. Plaintiff, Georgia M. Scott, is now a citizen and resident of San Marcos, Texas.

6. Defendant, Department of Justice, Federal Bureau of Investigation, is a Federal Government Agency. The FBI may be served with process through United States Attorney General, Jefferson B. Sessions, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001, and United States Attorney for the District of Nebraska, Joseph P. Kelly, 1620 Dodge Street #1400, Omaha, NE 68102.

## UNDERLYING FACTS

7. Ms. Scott, an African-American female, was hired by the FBI in June 1998. She worked as an Investigative Specialist ("IS") from June 2003 to December 2009 in the FBI's Chicago, Illinois, and San Antonio, Texas Field Offices.

8. Because of her performance, the FBI promoted Ms. Scott. Beginning December 9, 2009, she worked as Supervisory Investigative Specialist ("SIS") for a

newly authorized Mobile Surveillance Team ("MST") in the FBI's Omaha, Nebraska Field office.

9. When she assumed the new position in the Omaha Field Office, Ms. Scott was the only black female supervisor in the Omaha Field office. Throughout her tenure at the Omaha Field Office, Ms. Scott reported up the chain of command through layers of non-black members of FBI management.

    a. Ms. Scott's direct supervisor was the manager of the Intelligence Squad, Supervisory Special Agent ("SSA") Shane Utter. She reported to SSA Utter when she first assumed her SIS role in Omaha in December 2009 and was under his supervision until May 2011. SSA Utter rated Ms. Scott's performance as "Excellent" on each of her annual Performance Appraisal Reports (PARs) during his 3-year tenure as her supervisor.

    b. Beginning in May 2011 and for all remaining relevant periods, SSA Jay Emigh took over as Ms. Scott's direct supervisor. He is Caucasian.

    c. Assistant Special Agent in Charge ("ASAC") James Langenberg, also Caucasian, was Ms. Scott's second line supervisor for the entire period pertinent to the actions at issue.

    d. Weysan Dun was the Special Agent in Charge ("SAC") of the Omaha Division from approximately 2010 through April 2012. He is not African American.

e.  Thereafter, Thomas Metz became the SAC for the Omaha Division. Metz is also Caucasian.

## THE FBI ENGAGES IN DISCRIMINATORY AND HARASSING ACTS

### A. SSA Emigh Undermines Ms. Scott's Authority

10. Before and after SSA Emigh became Ms. Scott's supervisor, SSA Emigh harassed Ms. Scott based on her sex, race, and later retaliated against for her use of the FBI's equal employment opportunity ("EEO") process.

11. In a May 24, 2011 meeting with Ms. Scott, SSA Emigh accused Ms. Scott of being "rigid" and "angry." He told her that employees she supervised perceived her as "rigid" and "angry" because she refused to give preferential treatment to a pregnant Caucasian employee.

12. SSA Emigh's accusations occurred during a meeting to discuss Ms. Scott's performance. Ms. Scott informed her supervisors she had offered the pregnant employee both desk duty, as requested, and day-time hours. Instead, the employee wanted to terminate her two-year contract with the surveillance team. Behind Ms. Scott's back, SSA Emigh offered accommodations to the pregnant employee that were not possible, *e.g.,* placing her on a different schedule, not requiring her to travel, not requiring late night shifts. SSA Emigh thereafter informed Ms. Scott not only that "rules are meant to be broken," but that "we need to walk gingerly around a pregnant employee" because "that damn [SSA] was responsible for his wife having a miscarriage."

13. SSA Emigh's handling of this issue started a pattern that continued for well over two and a half years. Ms. Scott issued directives to employees reporting to

her and if the employee did not like Ms. Scott's direction, he or she would circumvent Ms. Scott and take his or her request to SSA Emigh. SSA Emigh granted the employee's request, without consulting Ms. Scott or considering repercussions of his decision.

### B. SSA Emigh Re-Evaluates Ms. Scott's Decisions

14. SSA Emigh contacted Ms. Scott after she refused to promote for one of her direct reports. SSA Emigh informed Ms. Scott she needed to show good faith in her employees. SSA Emigh again informed Ms. Scott her direct reports were complaining to him that she was being harsh. Ms. Scott's direct reports were almost uniformly male; none were African-American.

15. Ms. Scott informed SSA Emigh she appreciated he was not aware of all the details that resulted in her decision not to promote her direct report.

16. Ms. Scott also informed SSA Emigh the issue had previously been addressed in February with SSA Utter and ASAC Langenberg. Both Utter and Langenberg approved of Ms. Scott's decision not to promote. She informed SSA Emigh it was inappropriate for him to re-evaluate every decision she made as to her direct reports.

### C. Ms. Scott's Superiors Stereotype Her as An Angry Black Woman - "Intimidating, Crude, and Mean."

17. On January 18, 2012, Ms. Scott was summoned to a meeting with SSA Emigh, ASAC Langenberg, and SAC Dun. The meeting started on an odd note when SAC Dun first asked Ms. Scott about her responsibilities for her elderly parents. He then commented, "Well, we know you're not married." SAC Dunn then asked Ms. Scott if

there were any mitigating circumstances that would explain her mean, rude, intimidating and overall angry behavior toward her direct reports. Throughout this meeting, SAC Dun and SSA Emigh repeatedly accused Ms. Scott of being angry, loud, talkative, intimidating, harsh, crude, and mean.

18. Ms. Scott tried to defend herself in the meeting, but SAC Dun viewed her attempts at self-defense as validating his accusation that she was mean and angry. SAC Dun threatened to put Ms. Scott on a Performance Improvement Plan (PIP) or submit her to the Office of Professional Responsibility (OPR) based on her reactions to his accusations.

19. About a month later, Ms. Scott was scheduled to have a follow-up meeting with SAC Dun, ASAC Langenberg, and SSA Emigh. On February 10, 2012, Ms. Scott attempted to present documents showing that many of her subordinates' verbal accusations were false. Her superiors refused her documentation or consider any details behind the accusations of her direct reports. To the contrary, ASAC Langenberg expressed disappointment in Ms. Scott for refusing to accept responsibility for the accusations about her. ASAC Langenberg refused to consider or discuss the individual circumstances or details of the MST members' individual accusations against Ms. Scott.

20. During this meeting, Ms. Scott specifically informed her all male, all Caucasian management team that the allegations and perceptions against her stemmed from her race and sex. She informed SSA Emigh, ASAC Langenberg, and SAC Dun that her male Caucasian subordinates were finding it difficult to report to a tall, imposing, African-American female supervisor. Ms. Scott provided her supervisors with a copy of an article describing former First Lady Michelle Obama as a stereotypical "angry black

6

female." Ms. Scott contended that her direct reports and the management team also treated her as an angry black female. She provided examples through the language her subordinates used, the demeaning tenor of her treatment, the undermining and usurping of her authority by her superiors, and her direct reports circumventing the chain of command.

21. ASAC Langenberg claimed to be familiar with the article Ms. Scott referenced. He insisted that Ms. Scott's case was entirely different and declared there was no racism or sexism present in Ms. Scott's case. According to ASAC Langenberg, these issues simply were not present in Ms. Scott's employment.

**D. Despite ASAC Lanageberg's Protestations, Ms. Scott was Told to Pay more Attention to Her Appearance and Given a Developmental Plan to be Nicer to Her Subordinates**

22. As a direct result of this February meeting, Ms. Scott was ordered to pay more attention to her appearance. Although not ordered specifically to wear more skirts, dresses, and high heels, as soon as she did so, SSA Emigh commented, "You clean up nicely."

23. Ms. Scott was also presented with a Developmental Plan created by SSA Emigh which required Ms. Scott to "smile occasionally when dealing with her subordinates." SSA Emigh also directed Ms. Scott to moderate her volume when dealing with her subordinates and avoid denigrating language" in reference to use of the "F" word. Ironically, Ms. Scott did not and does not use "F" bomb language – her direct reports did, however, and so did her management team.

7

**E.     SSA Emigh Relied on Ms. Scott's Male Subordinates' Opinions <u>When making Personnel Decisions than Ms. Scott's Assessments</u>**

24.     Ms. Scott told SSA Emigh on August 24, 2012 that one of her direct reports was not able to perform adequately on his assigned surveillance duties. SSA Emigh balked, rejecting Ms. Scott's assessment, stating "The guy had been s**t on by his dad and now we are doing the same thing." SSA Emigh refused to allow Ms. Scott to remove him from the surveillance team, as proposed.

25.     Later, when Ms. Scott and SSA Emigh met on September 4, 2012 on an unrelated issue, SSA Emigh raised the issue of the same direct report's status. He told Ms. Scott he had consulted with another of her subordinates about the direct report's surveillance abilities. SSA Emigh admitted to Ms. Scott that he was now uncertain as to whether surveillance was the appropriate assignment for the direct report.

26.     In sum, SSA Emigh relied on a report by one of Ms. Scott's Caucasian male subordinates, whom Ms. Scott had trained, while ignoring her assessment. Not surprisingly, SSA Emigh then blamed Ms. Scott for the direct report's ongoing poor performance and told her to figure out how she was going to handle it.

27.     In November 2012, Ms. Scott was again singled out as the only supervisor accused of being "mean" when she did not approve leave for a particular Caucasian male employee over Thanksgiving. SSA Emigh threatened Ms. Scott as a result, stating he could be mean too and deny her leave. Ms. Scott explained to SSA Emigh she needed to make the holiday offer to the entire team to be fair. SSA Emigh disagreed, advising her "no, you don't have to open the floodgates" in reference to a Hispanic male employee who had also requested leave over Thanksgiving.

28. In January 2013, Ms. Scott issued a Developmental Plan to another of her direct reports who was not performing at minimal standards. SSA Emigh criticized Ms. Scott, informing her once again that her treatment was too "harsh."

29. In a February meeting concerning the same issue, ASAC Langenberg said the Developmental Plan written by Ms. Scott was well done. In a complete reversal of direction, however, he and SSA Emigh required that Ms. Scott recommend the employee for a promotion. Thereafter, as before, SSA Emigh admitted to Ms. Scott that after talking with her subordinates -- again, a Caucasian male employee whom Ms. Scott had trained – he was going to talk with the direct report about his performance.

### F. SSA Emigh Approves Violations of Policy by Ms. Scott's Subordinates

30. SSA Emigh commanded an audience with Ms. Scott again in June 2013 because, as he described it, "the grumblings" by her direct reports were beginning again. According to SSA Emigh, his male colleagues complained to him that working for a woman was different than working for a man.

   a. SSA Emigh reminded Ms. Scott her subordinates looked to her as a "mother" figure.

   b. He sent an email to Ms. Scott's team overriding Ms. Scott's decision denying compensatory time to employees for "drive time" while on a temporary duty ("TDY") assignment. Ms. Scott informed SSA Emigh drive-time compensation was not allowed before a fifty-mile radius and she could be referred for an OPR. SSA Emigh informed Ms. Scott if she did not "get with it, it will affect your PAR."

      c.      Later, SSA Emigh found out Ms. Scott was correct in her application of the drive time policy. SSA Emigh apologized and sent an email to MST personnel letting them know, but he refused to rescind the additional compensatory time.

31.    SSA Emigh granted one of Ms. Scott's subordinates permission to bring his dog with him when the team travelled on assignment. SSA Emigh acceded to the request, which was against FBI policy, because the subordinate was having issues finding a dog-sitter. Ms. Scott protested but SSA Emigh responded to her claim that his was against FBI policy by stating, "What Mama don't know won't hurt her."

32.    During the same time period, SSA Emigh participated in a meeting with one of Ms. Scott's direct reports because the employee did not feel Ms. Scott was being fair in assessing the employee's work performance. In that meeting, SSA Emigh defended the employee, stating, "It's okay to fall asleep on the job. It is not a big deal. It happens." SSA Emigh then explained that while he was assigned to the FBI office in Chicago, he too fell asleep on the job. Once again, SSA Emigh undermined Ms. Scott's authority by siding her direct report and doing so in a meeting with the direct report and condoning unacceptable work behavior.

      **G.**    **The FBI Labels Ms. Scott "Mean, Selfish, and Narcissistic" Because She Attempted to Defend Allegations Against Her**

33.    ASAC Langenberg met with Ms. Scott on October 2013, to put her on a PIP. He started the meeting by telling Ms. Scott not to pay attention to the content of the PIP. Instead, ASAC Langenberg told Ms. Scott to focus on her team's perception of her.

      a.      During the meeting, ASAC Langenberg gave Ms. Scott time to read the PIP.  When she was done, she told ASAC Langenberg the PIP was inaccurate and included both lies and exaggerations.  ASAC Langenberg's response: all the allegations are true.

      b.      ASAC Langenberg reminded Ms. Scott of the consequences of not meeting the PIP's requirements and failing to gain SSA Emigh's approval: demotion, reassignment, or termination.  ASAC Langenberg

      c.      Langenberg refused to allow Ms. Scott to defend herself.  Instead, he told Ms. Scott to go home, sleep on it, and come back the next day with a different frame of mind.

34. ASAC Langenberg and Ms. Scott met the next day.  Again, Ms. Scott began trying to defend herself.  ASAC Langenberg sighed, shaking his head.  SSA Emigh interjected himself into the discussion and told Ms. Scott her problem was she was "mean, selfish, and narcissistic."  SSA Emigh informed Ms. Scott if employees had come to his boss with the allegations against her, he would just quit.  He accused Ms. Scott of never showing remorse since the first time they addressed the issues with Ms. Scott in January 2012.  He took offense because Ms. Scott had not apologized to him or any of the management team for having to "waste" so much time with her to straighten out "her mess."  SSA Emigh summarized his perception, stating, "You don't even have the reaction of a normal person.  This is not the reaction of a normal person.  Maybe it was the way you were raised."

35. Because of the accusations, name-calling and lack of respect to which she was subjected in this meeting, Ms. Scott asked ASAC Langenberg if it was too late to step down. She informed ASAC Langenberg she could not confess to false accusations and told him the situation had continued for too long, making her tired of continuously being harassed and bullied. She told her supervisors the she could not transfer from the Omaha Division, if an opportunity presented itself unless the PIP was concluded. Ms. Scott also advised ASAC Langenberg the harassment was affecting her health, she was having problems sleeping and eating, and she needed to leave as soon as possible because Omaha would not accept her.

**H.** <u>**Ms. Scott is Forced to Sign a "Voluntary" Demotion**</u>

36. Based on the foregoing meeting with her management team, Ms. Scott was forced to sign a "voluntary" demotion form from Human Resources Division on October 24, 2013. Ms. Scott informed SSA Emigh she wanted to tell her team of the change. SSA Emigh admitted he already had told one of Ms. Scott's direct reports that she was contemplating a demotion and asked that direct report if he was willing to assume her duties.

37. The FBI then officially demoted Ms. Scott to an Investigative Specialist on November 2, 2013. SSA Emigh instructed her later that month to come to the office to sign a PAR. She received an overall rating of "Unsuccessful" on the PAR, but she refused to sign it.

38. Ms. Scott participated in an Alternative Dispute Resolution session in December to try to resolve issues of both discrimination and retaliation she experienced for reporting her concerns to the FBI. ASAC Langenberg showed up uninvited and Ms.

Scott was put in the uncomfortable position of having to ask him to leave, as he was not allowed to attend. Her issues were not resolved.

39. Thereafter, on January 27, 2014, Ms. Scott filed her EEOC complaint alleging discrimination and harassment based on sex and race and retaliation.

## CLAIM I

## SEX DISCRIMINATION

39. Ms. Scott incorporates by reference paragraphs 1-38, inclusive, as if fully set forth.

40. According to Title VII of the Civil Rights Act of 1964,

> It shall be an unlawful employment practice for an employer –
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color … sex;
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color … sex.

42 U.S.C. § 2000e-2.

41. In order to establish a prima facie case of discrimination based on race or sex, Ms. Scott must show (1) she is a member of a protected class (2) that she was subjected to an adverse employment action, and (3) that, in being so subjected, she was treated differently and less favorably than similarly situated individuals not in the protected class. *See Potter v. Goodwill Industries of Cleveland, Inc.*, 518 F.2d 864 (6th Cir. 1975).

42. The FBI's disrespectful and harassing conduct, as exhibited by SSA Emigh and ASAC Langenberg was a regular component of Ms. Scott's day-to-day work environment. FBI management knew of and perpetrated the harassment, in direct contravention of 42 U.S.C. § 2000e-2 and Neb. Rev. Stat. § 48-1104.

43. Ms. Scott is a female who was assigned to a male work environment. Her direct reports were males and her supervisors were males. Ms. Scott's previous supervisor, SSA Utter, gave her high evaluation scores, finding Ms. Scott performed well. SSA Utter rated her an "Excellent" on each of her annual Performance Appraisal Reports during his 3-year tenure as Ms. Scott's supervisor.

44. Both before and after SSA Emigh became her supervisor, SSA Emigh harassed Ms. Scott based on her sex, race, and later in retaliation for her involvement in the EEO process. When SSA Emigh was established as Ms. Scott's supervisor, he overrode Ms. Scott's decisions, undermined her authority, and re-directed her subordinates to see him, not Ms. Scott, with complaints and requests.

45. Male employees in Ms. Scott's position were not subjected to the same treatment. No male supervisor was reprimanded for being "mean" when denying leave requests. No male supervisors were told to "smile" at their direct reports, told to moderate the tone and volume of their voices, or accused of being mean, angry, or argumentative.

46. The FBI did not treat Ms. Scott as it treats male employees in equal positions. No other male employees were placed on a PIP for their appearances. No other male employees were forced to accept a demotion to maintain their employment.

47. There is no legitimate basis justifying FBI's discriminatory treatment of Ms. Scott because she is female.

WHEREFORE, Ms. Scott requests judgment ordering an award of damages pursuant to 42 U.S.C. § 2002e-2 *et seq.* and Neb. Rev. Stat. § 48-1119(4) based on the FBI's discriminatory terms and conditions of employment.

## **CLAIM II**

## **RACE DISCRIMINATION**

48. Ms. Scott incorporates by reference paragraphs 1-47, inclusive, as if fully set forth.

49. SSA Emigh harassed Ms. Scott based on her race before he was her supervisor. Ms. Scott was the only African-American and female supervisor in the Omaha Division. She was the only supervisor stereotyped or accused of mean, rude, angry behavior.

50. Ms. Scott provided an article stereotyping Michelle Obama as an "angry black female." She pointed out to the management that the FBI, through the management team's language, demeaning tenor, and undermining her authority, was treating her as a stereo-typical "angry black female."

51. SSA Emigh relied on "advice" from Ms. Scott's Caucasian male subordinates with respect to personnel issues. He simply ignored Ms. Scott's assessments on these same issues.

52. The FBI did not treat Ms. Scott as it treats Caucasian employees in equal positions. In fact, the FBI treated Ms. Scott's Caucasian male direct reports more favorably than it treated her.

53. There is no legitimate basis justifying FBI's discriminatory treatment of Ms. Scott because she is African-American.

WHEREFORE, Ms. Scott requests judgment ordering an award of damages pursuant to 42 U.S.C. § 2002e-2 *et seq.* and Neb. Rev. Stat. §48-1119(4) based on the FBI's discriminatory terms and conditions of employment.

## CLAIM III

## RETALIATION

54. Ms. Scott incorporates by reference paragraphs 1-53, inclusive, as if fully set forth.

55. Both the Nebraska Fair Employment Practice Act ("NFEPA") and Title VII prohibit retaliation:

> It shall be unlawful employment practice for an employer to discriminate against any of his or her employees…because he or she (1) has opposed any practice made an unlawful employment practice by the Nebraska Fair Employment Practice Act, (2) has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the act, or (3) has opposed any practice or refused to carry out any action unlawful under the laws of the United States or this state.

Neb. Rev. Stat. § 48-1114; *see* 42 U.S.C. § 2000e3-a.

56. To state a retaliation claim, Ms. Scott must show (1) she engaged in statutorily protected activity by either participation and/or protesting what she believed in good faith to be discriminatory conduct, (2) the Agency officials were aware of the protected activity, (3) she suffered an adverse employment action, and (4) a causal connection between her engagement in protected activity and the adverse employment action. Close temporal proximity between protected activity and an adverse employment action raises an inference of causation.

16

57. Ms. Scott was involved with the FBI's internal EEO process as early as May 2011 when she contacted the EEO office to determine whether she could be subject to an EEO complaint for giving preferential treatment to a pregnant employee.

58. In the instant case, Ms. Scott first contacted an EEO counselor on October 23, 2013 regarding her discrimination and retaliation claims.

59. SSA Emigh may claim he did not know of Ms. Scott's involvement with the FBI's EEO process until December 19, 2013. Beginning in February 2012, however, Ms. Scott verbally informed her supervisors that she had sought EEO counseling because she was an African American female and being subjected to discrimination.

60. The FBI threated Ms. Scott with either a PIP or being sent to OPR at the same time Ms. Scott first became involved in the EEO process in February 2012. In fact, the FBI, via ASAC Langenberg, placed Ms. Scott on a Developmental Plan and a PIP as soon as Ms. Scott became involved in the EEO process.

WHEREFORE, Ms. Scott requests judgment ordering an award of damages pursuant to 42 U.S.C. § 12203 *et seq.* and Neb. Rev. Stat. § 48-1119(4) based on the FBI's retaliatory terms and conditions of employment.

## REQUESTED RELIEF

WHEREFORE, Ms. Scott seeks judgment against the FBI and damages, as set forth below:

    A. Damages for lost wages based on her demotion from her GS-12 position, lost benefits and economic losses proximately caused by the discriminatory, harassing, and unlawful actions referred to above.

B. Damages for costs incurred as a result of the her transfer out of the Omaha Division to the San Antonio Division.

C. Damages for Ms. Scott's reasonable expenses and costs including attorney's fees, as provided by statute.

D. Interest on the judgments against the FBI at the legal rate from the date of loss.

E. That Defendant be taxed with the costs of this action; and

F. Such other and further relief as it may deem just and proper.

DATE: <u>June 22, 2018.</u>

                                 **GEORGIA SCOTT, Plaintiff**

By:    /s/*Terry A. White*
        Terry A. White, NE #18282
        Carlson & Burnett, LLP
        17525 Arbor Street
        Omaha, NE 68130
        Direct (402) 682-8006
        Main (402) 934-5500
        terry@carlsonburnett.com
        Attorney for Plaintiff